## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ARBOL INC., | |
| Plaintiff, | Civil Case No. _____ |
| -against- | **COMPLAINT** |
| HCC INSURANCE HOLDINGS, INC. and SCOTT KLEMM, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Arbol Inc. ("Arbol"), by and through undersigned counsel, alleges as follows against Defendants HCC Insurance Holdings, Inc. ("HCC") and Scott Klemm ("Klemm"):

### NATURE OF ACTION

1.      This action is to recover against the wrongful solicitation of employees and the wrongful use and misappropriation of trade secrets and other confidential information.

2.      Arbol is an innovative pioneer in managing climate risk and a leader in the rapidly growing parametric insurance and weather derivatives industry. HCC, part of a traditional insurance conglomerate that had no parametric insurance business, considered investing in Arbol's growth and development but passed on the opportunity. Instead, HCC used the information and other trade secrets it learned from Arbol and poached three senior executives—including Klemm—to start its own, competing parametric unit. HCC's and Klemm's actions violated their contractual obligations to Arbol and the law.

3.      Arbol brings this case to redress the harms it suffered as a consequence of HCC's and Klemm's misconduct and prevent further exploitation of their ill-gotten advantages.

## PARTIES

4.     Plaintiff Arbol Inc. (referred to above as "Arbol") is a corporation organized under the laws of Delaware. It maintains its principal place of business in New York, New York.

5.     Defendant HCC Insurance Holdings, Inc. (referred to above as "HCC") is a corporation organized under the laws of Delaware. On information and belief, it maintains its principal place of business in Houston, Texas. On information and belief, it also maintains New York offices in New York City, Mount Kisco, and Melville.

6.     Defendant Scott Klemm (referred to above as "Klemm") is a natural person. On information and belief, he is domiciled in Chicago, Illinois.

7.     Nonparties Hector Ibarra Pando ("Ibarra") and Christopher Muir ("Muir") are natural persons. On information and belief, they are domiciled in Spain and the United Kingdom, respectively. Klemm, Ibarra, and Muir are collectively referred to as the "Solicited Employees."

## JURISDICTION AND VENUE

8.     This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this is an action arising under the laws of the United States, namely the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq*. This Court also has supplemental jurisdiction over state-law claims pursuant to 28 U.S.C. § 1367(a) because those claims are part of the same case or controversy.

9.     The Court has specific personal jurisdiction over HCC because HCC submitted to the personal jurisdiction of the state and federal courts in New York County in the State of New York in a Mutual Non-Disclosure Agreement ("MNDA") executed on October 19, 2022. MNDA § 11. This Court also has specific personal jurisdiction over HCC under New York's long-arm statute, C.P.L.R. § 302(a)(3), because it has committed tortious acts outside New York causing injury to Arbol within New York and, on information and belief, (i) regularly does or solicits business or engages in

other persistent courses of conduct or derives substantial revenue from goods used or consumed or services rendered in New York; or (ii) expects or should reasonably expect the acts to have consequences in New York and derives substantial revenue from interstate or international commerce.

10.    The Court has specific personal jurisdiction over Klemm under New York's long-arm statute, C.P.L.R. §§ 302(a)(1) and (3), because he was formerly employed by Arbol, a New York-based company; traveled to New York on multiple occasions in connection with his employment, including for the development of the proprietary and confidential information from which the asserted claims arise; and entered into employment agreements with Arbol governed by the laws of the State of New York, under which he gained access to proprietary and confidential information from which the asserted claims arise.

11.    Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims against all Defendants occurred within this District. Additionally, HCC agreed that the state and federal courts in New York County in the State of New York shall be the exclusive venue for disputes arising under the MNDA. § 11.

## STATEMENT OF FACTS

### I.    Arbol and Its Business

#### A.    Parametric Risk Transfer

12.    Since its inception in 2018, Arbol has been at the forefront of transforming how the world protects against climate risk. For years, the dominant approach had been indemnity insurance. As any homeowner who has filed a claim for a leaky roof after a hurricane knows, indemnity insurance is slow and subjective because it relies on manual adjusters to assess loss. Arbol is a pioneer in a nascent alternative: parametric products, which offer swift, objective, and scalable payouts, addressing specific climate risks with no room for disputes or delays.

13.     While the parametric risk-transfer market is small compared to traditional markets, it has grown in the past few years. The size of the parametric insurance market was estimated at $11.7 billion in 2021 and had grown to $18 billion in 2023. Trading activity on the Chicago Mercantile Exchange in weather futures and options—another type of parametric product offered by Arbol—grew twelve-fold between 2019, a year after Arbol was founded, and 2023. By 2024, mainstream publications like the *Seattle Times* were reporting on parametric weather insurance.[1]

14.     Unlike traditional indemnity insurance, parametric risk transfer is based on automatic calculations, not human adjusters. Arbol's agreements with its clients embed formulas tying payouts to reported weather parameters such as temperature, wind speed, or rainfall. Thus, for example, a farmer may receive a payout if the average rainfall on her farm fell below (or above) a certain threshold, jeopardizing the harvest. The amount she receives would be derived from the rainfall data, not a determination of crop loss for a covered peril as subjectively determined by an adjuster.

15.     The quick and objective nature of parametric approaches has obvious appeal because climate risk can be quantified and weighed against revenue in many industries. In the energy sector, for example, the profits of gas suppliers are affected by temperature, of wind farms by wind speed, and of solar farms by solar irradiance. Travel and leisure are measurably disrupted by rain and snow. Reinsurance (insurance purchased by insurance companies) can also be packaged as a parametric product: property insurance companies writing named storm coverage, for example, can reinsure their losses through policies based on geographic distance between insured locations and hurricanes. With climate change expected to increase the unpredictability and

---

[1] *See* Cipher News & Bill Spindle, *Increasingly popular 'parametric insurance' helps farmers and others hit hard by extreme weather*, Seattle Times (July 12, 2024, 6:35 AM), https://www.seattletimes.com/business/increasingly-popular-parametric-insurance-helps-farmers-and-others-hit-hard-by-extreme-weather/ (last visited Feb. 18, 2025).

severity of all kinds of weather phenomena, effective risk management becomes increasingly important across the economy.

16.     But parametric products do not sell themselves. While the benefits are intriguing—and for some, a no-brainer—they are also novel and complex approaches to risk management. A farmer may not know precisely what effect a one-degree drop in average temperature is likely to have on her harvest. Construction companies do not have charts plotting inches of rain against lost productivity. Parametric products are great solutions for many industries, but educating customers, understanding their needs, and tailoring effective and profitable solutions requires time and effort.

17.     Deploying that time and effort to educate clients and close deals has been key to Arbol's success. Arbol's staff regularly attend and speak across the world at industry conferences, take meetings with companies large and small, and develop pitches and custom solutions. What Arbol lacks in size, it makes up for in agility. If a promising lead surfaces, Arbol's staff can be ready with a demonstration or quote. This approach has led Arbol to working with customers ranging from sole proprietorships in Europe to multibillion dollar reinsurers in Bermuda. And Arbol has written custom software—both for internal and external use—to support these business development efforts and grow its offerings.

18.     Arbol fills a gap unaddressed by the traditional markets. Though a young and small startup, Arbol's disruptive products demonstrate the shortcomings in incumbents' offerings. In approximately three years, Arbol has originated over one billion dollars in risk transfer—a significant fraction of the market relative the company's small size. It has also achieved profitability and raised millions in equity investments, all while other startups and insurance companies have floundered.

19.     In reaching this level of success, Arbol has had to navigate substantial regulatory hurdles. Arbol aims to operate globally and sell its products all over the world. But parametric products can be structured in a variety of ways—including as

weather index derivatives and parametric insurance products—which are subject to vastly different regulatory regimes across jurisdictions. Because some customers prefer one structure over the other, Arbol has invested considerable resources to gain specialized expertise and build up its legal and technical infrastructure to sell its products as widely and quickly as possible.

20.     In addition to investing time and resources into business development, Arbol has poured money into technology. Arbol's engineers and data scientists work hand-in-hand with meteorologists to study weather patterns, collect and standardize data, and develop cutting-edge models to predict outcomes. As a result, Arbol is able to offer competitive pricing, allowing salespeople like the Solicited Employees to develop contacts and gain a foothold with clients that would otherwise be out of reach.

**B.      Arbol's Business Model**

21.     Arbol's strengths are in finding customers, structuring deals, and calculating pricing. Like with traditional indemnity insurance, Arbol's clients pay premiums up front in exchange for a much larger payout (up to a predefined limit) if a weather event occurs.

22.     As a relatively small company, Arbol does not maintain capital reserves to satisfy payout obligations. Instead, Arbol enters into agreements with much larger firms called "capacity providers." Arbol pays capacity providers the lion's share of the premiums it receives, keeping a percentage for itself. In exchange, the capacity providers agree to make payouts should the weather events occur. Arbol's expertise in predicting weather phenomena and setting premium pricing relative to payout obligations ensures that its capacity providers turn a profit on average.

23.     Because Arbol always receives a portion of premium payments while other entities take on the risk of a payout, Arbol makes money on every contract—even if there's a payout up to the total limit. Arbol's incentive to price deals profitably derives

from its desire to build long-term relationships with capacity providers, not the profit or loss of any specific deal.

### C. Arbol's Trade Secrets

24. Arbol carefully guards its confidential information and intellectual property. Because the viability of its business model relies on long-term relationships with clients and capacity providers, Arbol considers its client relationships, acquisition strategies, and deal history just as sensitive as technical intellectual property like its weather models and pricing methodologies. To protect its confidential information, Arbol requires all employees and consultants, regardless of roles, to execute non-disclosure agreements and affirm that intellectual property they create on behalf of Arbol belongs to the company. Arbol's leads, client lists, and deals are managed and tracked in secure, password-protected databases, just as its software and data are managed and tracked on secure, password-protected servers.

25. Although the majority of Arbol's employees work remotely, Arbol maintains some sensitive information in its New York office, which is protected by employee key cards and security guards.

26. The Solicited Employees had access to and helped develop confidential information—including trade secrets—for Arbol.

27. The Solicited Employees met with a plethora of potential customers and clients across continents and industries. In so doing, they learned about the customers' businesses and unique needs, including (by way of example only) exposure to perils and market conditions, pricing requirements, credit requirements, and regulatory requirements. These lists of clients and their needs constituted valuable trade secrets (collectively, "Business Trade Secrets").

28. The Solicited Employees would not have had access to those customers— or, in many cases, even known about the customers—without substantial investment from Arbol. Arbol devoted resources to developing marketing and pitching materials for

use by the Solicited Employees, including making engineers and data scientists available to answer questions about pricing and other issues. Much of the information received from clients was treated as sensitive and delivered to the Solicited Employees only after Arbol executed non-disclosure agreements, sometimes after extensive negotiation. And Arbol supported and encouraged all three Solicited Employees' business development activities, bolstering their presence at and encouraging speaking opportunities at industry trade shows and conferences, which provided them a greater platform to sell parametric products and understand and develop the market.

29.     In the course of their work, the Solicited Employees also had access to Arbol's pricing data, financial forecasts, Arbol's and its capacity providers' trading positions, and Arbol's views on a variety of markets (collectively, "Technical Trade Secrets"). This confidential information likewise constituted trade secrets.

30.     Arbol carefully protected the Business Trade Secrets and Technical Trade Secrets with industry-standard security measures, including encryption, password-protected devices, and physical security.

## II.    The Solicited Employees

### A.    Scott Klemm

#### 1.    Klemm's Work at Arbol

31.     Klemm's first day of employment at Arbol was September 1, 2021. Although he had not previously worked in the parametric space, Arbol chose to hire him for his background in the energy markets. His initial title at Arbol was Head of Energy, but based on his early success and express commitment to the company's long-term growth, Arbol promoted him to "Global Head, Derivatives." In 2023, he accepted the role of Chief Revenue Officer—a position in which he oversaw and developed all Arbol's revenue-generating activities. Klemm helped originate over a billion dollars' worth of risk-transfer products throughout his tenure at Arbol, and he was well-compensated:

Arbol paid Klemm nearly two million dollars in salary and bonuses, making him one of the highest-paid employees at the company.

32.    Although Klemm's day-to-day duties shifted with his titles, Arbol's needs, and market conditions, he was always responsible for negotiating relationships and confirming deals with counterparties in weather index derivative deals. Klemm also traded exchange-listed derivatives on behalf of a large capacity provider.

33.    Many clients had needs that could potentially be fulfilled through either derivatives or insurance products. For that reason, Klemm was often present at and promoted products that could—or would eventually—also be structured as insurance.

34.    Arbol supported Klemm's business development activities. Because of the nature of Arbol's business model and Klemm's role in it, he had access to many potential clients and learned the unique needs of their businesses and industry. He also had access to considerable resources, including data platforms and platforms for sourcing potential leads. Arbol also paid for Klemm to travel to and speak at industry conferences and other events.

35.    Klemm had unparalleled access to Arbol's proprietary information and trade secrets, including the Business Trade Secrets and Technical Trade Secrets.

36.    As Chief Revenue Officer, he had fiduciary duties to Arbol, including the duty not to use Arbol's confidential information and business opportunities to compete with Arbol.

### 2.    *The Klemm Agreement*

37.    Like all employees, Klemm received and signed an employment letter when he started at Arbol. The letter incorporated a Confidentiality, Non-Solicitation and Non-Compete Agreement ("Klemm Agreement"). The Klemm Agreement is attached to this Complaint as Exhibit 1 and incorporated by reference as if fully stated herein.

38.    The Klemm Agreement recites that confidential information is Arbol's property. *See* § 1. It forbids him from disclosing confidential information or using it for

any reason other than in the course of his employment with Arbol. *See* § 2. It also forbids him from competing with Arbol "for the purpose or with the intent of using or exploiting any Confidential Information." § 3(b).

39.     In signing the Klemm Agreement, Klemm acknowledged that a violation would cause Arbol to "suffer imminent and irreparable injury" for which it would "have no adequate remedy at law." § 5. Accordingly, Klemm consented to enforcement of the agreement by injunctive relief and agreed that he would be liable for Arbol's costs in obtaining such relief, including reasonable attorney's fees. *See id.*

40.     Klemm's consent to the terms of the Klemm Agreement was a condition of his employment and continued employment at Arbol. It was also a condition to him gaining access to Arbol's confidential information and trade secrets. In signing the Klemm Agreement, Klemm "acknowledge[d] that the [agreement's] restrictions may limit [his] ability to engage in certain business activities, but [his] work and continued work, [his] compensation (including any stock options), and the other opportunities afforded by [his] work, together with [his] access to Confidential Information and Arbol's interest in restraining [him] from competing with or otherwise harming Arbol's business, are sufficient to justify such restrictions." § 4.

41.     As a sophisticated executive with almost two decades' experience in the financial industry, Klemm had opportunity to consult with counsel before signing the Klemm Agreement.

### B.    **Hector Ibarra Pando and Christopher Muir**

#### 1.    *Ibarra's and Muir's Work at Arbol*

42.     Ibarra was originally hired as "Vice Chairman, LATAM" to "[l]ead corporate strategic planning and business development in [the] LATAM region," "[c]oordinate business development activities with business development leaders [in] other regions," and "[d]evelop and maintain relationship[s] with carriers and capital providers that support [the] LATAM business."

43.     Over time, Ibarra's role evolved. In October 2023, he was promoted to "Global Head of Insurance Operations." In that role, he was responsible for overseeing the entirety of Arbol's parametric insurance business, including a general agency in the United States. He was also involved in developing custom products for a multinational global insurance carrier to distribute throughout Europe.

44.     Muir was originally hired as "Global Head of Insurance Origination" to "[d]evelop parametric business through [the] London market distribution channel"; "[c]oordinate business development activities with business development leaders in EMEA, LATAM, and APAC regions"; "[d]evelop and maintain relationship[s] with London market carriers and capital providers"; and "[c]onduct market research and general promotion."

45.     Muir's role also evolved. In April 2023, he was promoted to "Director, Arbol UK." In July 2024, he was again promoted to "Managing Director, Arbol Europe." In the time between Ibarra's and Mur's departures, Muir also took over Ibarra's duties, although he left before his title formally changed.

46.     The change in Muir's titles reflected Ibarra's and Muir's vision for their departments. Ibarra and Muir were hired to increase Arbol's global presence, and Arbol needed to obtain licenses to sell insurance outside of the United States. With consultation from Ibarra and Muir, Arbol formed a subsidiary, Arbol Ins Services (U.K.) Ltd ("Arbol UK"), which would apply for and receive governmental approval to carry on business in the United Kingdom as a managing general agency. Arbol UK formed its own subsidiary in Germany, Arbol Europe GmbH ("Arbol Europe"), which would apply for and receive governmental approval to carry on business in Europe. Due to the complexities of the regulations involved, Arbol engaged a vendor to provide corporate advisory and regulatory services and formally appointed Arbol UK to sell insurance on its behalf.

47.     As Muir's titles reflected, he served as a director of both Arbol UK and Arbol Europe. Ibarra also served as a director of Arbol UK. As directors, Muir and Ibarra had fiduciary duties to the two entities—and by extension, Arbol—including the duty not to use their confidential information to compete.

48.     Due to the heavy up-front regulatory requirements of Ibarra's and Muir's work, neither man sold any products before his departure. Despite the frustration and pressure on the business, however, Arbol continued to commit resources throughout Ibarra's and Muir's tenures. After their departures, Arbol has had to find suitable replacements, taking into account residence and experience requirements to satisfy the exacting insurance regulations in Britain and Europe.

49.     In cooperation with Klemm, Ibarra and Muir regularly met with prospective clients to discuss products whose precise structure had yet to be determined. Both men promoted novel products that could be structured as either derivatives or insurance. Ibarra's and Muir's work gave them access to Arbol's confidential and proprietary information, including the Business Trade Secrets and Technical Trade Secrets.

50.     As with Klemm, Arbol supported Ibarra's and Muir's business development activities. They had comparable access to many potential clients and learned the unique needs of their businesses and industry. Arbol also paid for each to travel to and speak at industry conferences and other events.

2.     *Deel*

51.     Because Ibarra and Muir are not United States citizens and were based abroad, Arbol engaged them through an employer-of-record vendor called Deel, Inc. Arbol and Deel, Inc. entered into a Master Services Agreement ("Deel MSA"), pursuant to which Arbol would identify foreign workers that it wished to engage to perform services for it. Deel, Inc.'s foreign affiliates (together with Deel, Inc., "Deel") would employ those workers to perform services on behalf of Arbol. Intellectual property rights

(which the Deel MSA defines as including "trade secret rights") acquired by Deel would be assigned to Arbol.

### 3.    *The Ibarra Agreement*

52.    Ibarra was employed through Deel pursuant to an agreement between Ibarra and Deel's Spanish affiliate ("Ibarra Agreement"). An excerpt including the relevant provisions of the Ibarra Agreement is attached to this Complaint as Exhibit 2 and incorporated by reference as if fully stated herein.

53.    The Ibarra Agreement explains that certain restrictions are a material condition of employment. *See* §§ 9, Sched. 1. Those restrictions include the preservation of confidentiality, including trade secrets, and the assignments of such trade secrets to the company. *See* Sched. 1 § 2.

54.    In signing the Ibarra Agreement, Ibarra acknowledged "that any breach of this Undertaking by [Ibarra] will cause irreparable damage to the Company." Sched. 1 § 4(a). He also agreed that the agreement's "restraints are necessary for the reasonable and proper protection of the Company and that each and every one of the restraints is reasonable in respect to subject matter, length of time and geographic area." Sched. 1 § 4(d).

55.    The trade secrets developed by Ibarra were assigned to Arbol by Deel through the operation of the Ibarra Agreement and the Deel MSA.

56.    As a sophisticated insurance executive with nearly two decades' experience in the industry, Ibarra had the opportunity to consult with counsel before signing the Ibarra Agreement.

### 4.    *The Muir Agreement*

57.    Muir was employed through Deel pursuant to an agreement between Muir and Deel's United Kingdom affiliate ("Muir Agreement"). An excerpt including the relevant provisions of the Muir Agreement is attached to this Complaint as Exhibit 3 and incorporated by reference as if fully stated herein.

58.     Like the Ibarra Agreement, the Muir Agreement explains that certain restrictions are a material condition of employment. *See* §§ 11, Sched. 1. Those restrictions include the preservation of confidentiality, including trade secrets, and the assignments of such trade secrets to the company. *See* Sched. 1 §§ 1–4.

59.     Muir's execution of the Muir Agreement was a condition of employment and continued employment at Arbol.

60.     The trade secrets developed by Muir were assigned to Arbol by Deel through the operation of the Muir Agreement and the Deel MSA.

61.     As a sophisticated insurance specialist with over a decade's experience in the industry, Muir had the opportunity to consult with counsel before signing the Muir Agreement.

### III.    Proposed Business Relationships with HCC

### A.    HCC

62.     HCC is one of a group of affiliated insurance companies called Tokio Marine HCC, itself a part of a conglomerate called the Tokio Marine Group. According to HCC's website, Tokio Marine Group had a market cap of $71 billion as of September 30, 2024.[2]

63.     An international insurance behemoth, Tokio Marine offers a dizzying array of insurance products ranging from the mundane (traditional casualty, errors and omissions) to the exotic (personal aircraft, ransom). Until a few months ago, however, neither HCC nor any other member of Tokio Marine had a dedicated parametric insurance unit.

64.     In October 2022, Arbol was raising equity funding to finance its growth, and HCC considered investing. Arbol also sought to expand its pool of capacity

---

[2] *See Our Story*, Tokio Marine HCC, https://www.tmhcc.com/en-us/about-us/our-story (last visited Feb. 18, 2025).

providers. Executives from the two companies corresponded and considered "forming a strategic partnership on multiple fronts."

### B.    The MNDA

65.    Before Arbol shared any confidential information, it asked HCC to execute a Mutual Non-Disclosure Agreement (referred to above as the "MNDA"). The MNDA is attached to this complaint as Exhibit 4 and incorporated as if fully set forth herein.

66.    Under the MNDA, the recipient of confidential information from the other party may not use it "for any purpose other than in connection with the Evaluation." § 3(b). The term "Evaluation" is defined broadly as "a potential relationship, cooperation, or transaction" between the parties. § 1.

67.    The MNDA also includes a non-solicitation clause. That clause forbids either party from "solicit[ing] for employment for itself or any of its subsidiaries any of the current officers or employees of the other Party with whom the first Party has had contact during the term of this Agreement and who became known to the first Party or who was identified to the first Party as part of the Evaluation." § 8. The prohibition lasts for twelve months after termination. *Id.* The agreement was effective October 19, 2022 and terminated two years later (*i.e.*, October 19, 2024). § 16.

68.    The parties acknowledged that either may seek equitable relief if the other breached or threatened to breach the MNDA. *See* § 9.

### C.    Arbol Shares Confidential Information with HCC

69.    After the parties signed the MNDA, Arbol gave HCC access to sensitive and confidential information via a password-protected "data room." The data room contained material proprietary information—business plans, historical returns and other financials (including revenue breakdowns by department), portfolio and pricing practices, industry analyses, investors and capacity providers, information about Arbol's technology systems and personnel, and other confidential information. For example,

HCC learned that Arbol had a highly profitable parametric weather derivatives energy business.

70.     On February 22, 2023, HCC's CFO communicated that HCC would not be investing in Arbol. He asked Arbol to "[p]lease keep [HCC] posted in the future on fundraise and business opportunities." Neither that email nor any other communication from HCC purported to terminate the MNDA.

71.     On February 5, 2024, staff from the two companies met via teleconference to discuss Arbol's product for managing hail risk—an issue especially important for solar farm operators and other renewables asset owners serviced by HCC and its subsidiary. All three Solicited Employees attended. Muir organized the call and identified Klemm as an important participant.

72.     The MNDA was still in effect, and the companies did not execute a new non-disclosure agreement for this meeting.

## IV.     HCC's and the Solicited Employees' Wrongful Acts

### A.     The Solicited Employees Resign from Arbol and Join HCC

73.     On August 8, 2024 Klemm informed Arbol that he would be resigning and left Arbol the next day. At around the same time, Ibarra communicated his intention to resign. After serving out a notice period, his employment ended on August 14. Then, Muir informed Arbol that he too would be resigning and ended his employment on September 4 after his notice period.

74.     These departures in rapid succession surprised Arbol. Merely days before his departure, Klemm had scheduled a call to discuss revenue projections with Arbol's CEO. All three had just supplied forecasts of significant revenue generation at Arbol's quarterly board meeting to directors and senior management on August 1. The onset of the active season for weather origination was coming up, and the team to execute those revenue generation plans had suddenly left.

75.     None of the three Solicited Employees informed Arbol what his future employment plans were. Ibarra even stated that he was planning on leaving the parametric market altogether. None updated his LinkedIn after leaving Arbol. As of the date of this Complaint, all of the three continue to list their most recent employer as Arbol on LinkedIn even though their employment at HCC has been publicized in trade publications.[3]

76.     Arbol's executives eventually learned from industry contacts that the three Solicited Employees had joined HCC to work at a new, competing parametric unit. In November, Arbol representatives encountered all of the Solicited Employees at an industry conference and observed them interacting with brokers and other counterparties that they had worked with when they were at Arbol. The Solicited Employees went out of their way to avoid Arbol's representatives, but one did eventually admit that the three had joined HCC.

**B.     Arbol's Correspondence with HCC**

77.     Concerned that HCC and the Solicited Employees may have violated non-solicitation and non-competition obligations, Arbol wrote to HCC through counsel letter on October 21. Arbol asked about the nature of the Solicited Employee's work at HCC, how HCC ensures that its employees do not violate obligations to previous employers, and the circumstances of the Solicited Employees' recruitment.

78.     HCC responded on November 19, confirming that Klemm, Ibarra, and Muir had started at HCC on August 19, September 2, and September 5, respectively, as "Senior Vice President, Parametric Weather," "Head of Parametric Weather

---

[3] *See, e.g.*, *Tokio Marine HCC bolsters parametric weather unit with Arbol's Muir and Ibarra*, Parametric Insurer (Oct. 25, 2024), https://www.theinsurer.com/parametric-insurer/news/tokio-marine-hcc-bolsters-parametric-weather-unit-with-arbols-muir-and-ibarra/; *Klemm and Tuinenburg join Tokio Marine HCC's parametric weather reinsurance unit*, Parametric Insurer (Nov. 14, 2024), https://www.theinsurer.com/parametric-insurer/news/klemm-and-tuinenburg-join-tokio-marine-hccs-parametric-weather-reinsurance-unit/. For the Court's convenience, copies of these articles are attached to this Complaint as Exhibits 5 and 6 and incorporated as if fully set forth herein.

Underwriting," and "Head of Parametric Weather, (Re)Insurance." The letter described Klemm's role as "executing HCC's parametric weather derivative program," which did not previously exist at HCC. The November 19 letter thus confirmed that the Solicited Employees was in fact helping HCC start a competing parametric unit and reprising in their roles at Arbol.

79.     HCC did not describe any processes in place to ensure that its new employees did not violate obligations to their previous employer, stating only in a conclusory manner that it "took affirmative steps prior to hiring these gentlemen to confirm that none of them was in possession of any confidential information" and reciting that none of the three violated any non-competition or non-solicitation information. HCC did not respond to—or even address—Arbol's question regarding the circumstances of the Solicited Employees' recruitment.

80.     Arbol and HCC continued the correspondence. Arbol responded on November 25, HCC responded on December 19, and Arbol responded on December 26. In its letters, Arbol pointed out HCC's own obligations under the MNDA, asked HCC to elaborate on the processes it took to prevent violations of its and the Solicited Employees' obligations, and again asked HCC to describe the circumstances of the Solicited Employees' recruitment. HCC denied that it was liable under the MNDA and failed to elaborate any further.

81.     Perhaps inadvertently, HCC's letters revealed that the Solicited Employees did in fact divulge confidential information. In its November 19 letter, HCC recited its "understanding" that none of the three Solicited Employees produced any substantial revenue in the twelve-month period prior to their termination. While that is not the case, how much revenue Arbol's employee generated in the twelve months prior to their termination is Arbol's confidential information, the disclosure of which has significant and damaging implications for Arbol's strategy and reputation. Arbol never shared

revenue information for that time period with HCC: the data room was opened in late 2022—almost two years before HCC poached the Solicited Employees.

## V.    Damages

82.    HCC's and the Solicited Employees' wrongful acts have caused and threaten to continue to cause substantial and irreparable damage to Arbol.

83.    Arbol has invested millions of dollars in developing the trade secrets described above, including the Business Trade Secrets and Technical Trade Secrets. Because Arbol's products are highly specialized, those trade secrets are especially valuable—and costly to lose. Beyond a small group of major industry players, there is a long tail of potential customers across a range of verticals like agriculture, energy, and travel. Each of these markets contains stakeholders with varying roles, sizes, risk tolerances, and regulatory constraints. Arbol has devoted substantial resources to develop clients contacts, understand unique demands, and tailor custom solutions to customers across the globe. It is this particularized approach that has allowed Arbol to grow and punch far above its weight. By misappropriating and using these trade secrets, HCC—an entity many times Arbol's size—is able to unfairly compete with Arbol and erode the competitive advantage Arbol has worked so hard to establish.

84.    Arbol had also spent considerable resources in building out its team. Klemm committed early to the company's success, and he was well-compensated for his performance. Arbol supported his, as well as Ibarra's and Muir's, business development activities. It relied on the representations in all three Solicited Employees' agreements to develop and share confidential information, including trade secrets. HCC now has access to the fruits of that labor.

85.    By signing the MNDA, HCC induced Arbol to give it confidential information about its business and products. It learned that Arbol had gained millions in its weather derivatives business, which it knew Klemm had been leading. It later learned about a potential hail product that would be beneficial to its subsidiary. But

instead of doing business with Arbol, HCC chose to simply exploit that information and the trade secrets possessed by Arbol's former executives, allowing it to unfairly compete. On information and belief—as demonstrated by the Solicited Employee's roles at HCC and their apparent willingness to share confidential information (albeit in a misleading and incomplete fashion)—they (and, by extension, HCC) have misappropriated and will continue to misappropriate Arbol's confidential information and trade secrets.

86.     The timing of the Solicited Employees' departure coincides with the onset of the active season for weather origination markets—especially the fourth quarter. Shortly before their departures, the Solicited Employees were forecasting significant revenue generation to Arbol's senior management and board of directors. Arbol was expecting the deals they were preparing from the infrastructure they established would generate substantial revenue.

87.     As a result of HCC's and the Solicited Employees' actions, Arbol has had to expend internal and financial resources on seeking, recruiting, and training replacement employees. Due to complex residency and citizenship requirements imposed by British and European regulations, Arbol has had to engage a recruiter to find suitable replacement candidates. Arbol has also had to expend resources on training replacements on its processes and rehabilitating the Solicited Employees' former projects.

88.     HCC and the Solicited Employees' actions have given the market false impressions about Arbol's business strategies and focus. *Parametric Insurer*, an online trade publication that reported on the Solicited Employees' departure, wrote that "Arbol is understood to be focusing on [a non-parametric insurance subsidiary], as well as its established agriculture, energy and reinsurance portfolios."[4] The Solicited Employees'

---

[4] *Arbol insurance origination head and Europe managing director Muir exits firm*, Parametric Insurer (Oct. 14, 2024), https://www.theinsurer.com/parametric-insurer/news/arbol-insurance-

departure—which appears to have been a coordinated effort—has created confusion and harmed Arbol's reputation among its customers, capacity providers, and investors, calling into question Arbol's reliability as a long-term business partner in the parametric space.

89.     Arbol's business is built for the long haul, and HCC's and the Solicited Employees' misconduct has harmed and disrupted its strategy in ways that may not even be immediately reflected in short-term revenue figures. First, if a capacity provider loses faith in Arbol, its very ability to do business is eroded. Second, short-term fluctuations in revenue figures do not fully capture damages, since Arbol's competitive advantage is reflected not only (or even primarily) in the profitability of individual trades, but in long-term relationships with clients and capacity providers. And third, Arbol's corporate strategy does not always lend itself to immediate returns: some deals require investment before any revenue can be realized at all, and the Solicited Employees' sudden departure has harmed Arbol's long-term customer relationships.

## FIRST CAUSE OF ACTION

### Breach of Contract (Non-Disclosure) – HCC

90.     Arbol incorporates by references and re-alleges all foregoing paragraphs.

91.     The MNDA is and was a valid, binding, and enforceable contract between Arbol and HCC.

92.     To the extent Arbol possessed any obligations under the MNDA, Arbol faithfully performed those obligations.

93.     As described in the foregoing allegations, under the terms of the MNDA, in exchange for access to Arbol's confidential and proprietary information and in connection with a potential relationship, cooperation, or transaction, HCC agreed that it

---

origination-head-and-europe-managing-director-muir-exits-firm/. For the Court's convenience, a copy of the article is attached to this Complaint as Exhibit 7 and incorporated as if fully set forth herein.

would maintain the confidentiality of and not disclose Arbol's confidential information, including its intellectual property and trade secrets, or use them other than in connection with evaluating the potential relationship, cooperation, or transaction.

94.     On information and belief, HCC breached the agreement by disclosing and using Arbol's confidential property and intellectual property, including the Business Trade Secrets and Technical Trade Secrets. This disclosure and use were not in connection with any relationship, cooperation, or transaction contemplated by the MNDA and were not authorized by Arbol.

95.     HCC's disclosure and use of Arbol's confidential information are a breach of HCC's obligations of the MNDA. *See, e.g.*, § 3.

96.     As a result of HCC's breach, Arbol has suffered and will continue to suffer damages in an amount to be determined at trial.

97.     In addition, pursuant to the terms of the MNDA, Arbol has the right and is entitled to seek enforcement of the MNDA by equitable relief. *See* § 9.

## SECOND CAUSE OF ACTION

### Breach of Contract (Non-Solicitation) – HCC

98.     Arbol incorporates by references and re-alleges all foregoing paragraphs.

99.     The MNDA is and was a valid, binding, and enforceable contract between Arbol and HCC.

100.     To the extent Arbol possessed any obligations under the MNDA, Arbol faithfully performed those obligations.

101.     As described in the foregoing allegations, under the terms of the MNDA, in exchange for access to Arbol's confidential and proprietary information and in connection with a potential relationship, cooperation, or transaction, HCC agreed that it would not solicit for employment for itself or any of its subsidiaries any of the current officers or employees of Arbol with whom HCC had contract during the term of the MNDA and who became known to HCC or was identified to HCC as part of the

evaluation of the potential relationship, cooperation, or transaction contemplated by the MNDA. This non-solicitation obligation lasts for twelve months after the date the MNDA was terminated, *i.e.*, until October 19, 2025.

102.    On information and belief, HCC breached the agreement by soliciting the Solicited Employees for employment while they were officers or employees of Arbol. HCC had contact with the Solicited Employees during the term of the MNDA, and they became known to HCC or were identified to HCC as part of the evaluation of the potential relationship, cooperation, or transaction contemplated by the MNDA. HCC solicited the Solicited Employees for employment before October 19, 2025.

103.    HCC's solicitation of the Solicited Employees is a breach of its obligations under the MNDA. *See, e.g.*, § 8.

104.    As a result of HCC's breach, Arbol has suffered and will continue to suffer damages in an amount to be determined at trial.

105.    In addition, pursuant to the terms of the MNDA, Arbol has the right and is entitled to seek enforcement of the MNDA by equitable relief. *See* § 9.

### THIRD CAUSE OF ACTION

### Breach of Contract (Non-Disclosure) – Klemm

106.    Arbol incorporates by references and re-alleges all foregoing paragraphs.

107.    The Klemm Agreement is and was a valid, binding, and enforceable contract between Arbol and Klemm.

108.    To the extent Arbol possessed any obligations under the Klemm Agreement, Arbol faithfully performed those obligations.

109.    As described in the foregoing allegations, under the terms of the Klemm Agreement, in exchange for employment and monetary compensation, Klemm agreed that he would maintain the confidentiality of and not disclose Arbol's confidential information, including its intellectual property and trade secrets, or use them outside of the scope of his employment with Arbol.

110.    On information and belief, Klemm breached the agreement by disclosing and using Arbol's confidential property and intellectual property, including the Business Trade Secrets and Technical Trade Secrets, in connection with his employment by HCC without authorization from or benefit to Arbol.

111.    Klemm's disclosure and use of Arbol's confidential information is a breach of his obligations under the Klemm Agreement. *See, e.g.*, § 2.

112.    As a result of Klemm's breach, Arbol has suffered and will continue to suffer damages in an amount to be determined at trial.

113.    In addition, pursuant to the terms of the Klemm Agreement, Arbol has the right and is entitled to seek enforcement of the Klemm Agreement through equitable relief. *See* § 5.

### FOURTH CAUSE OF ACTION

### Breach of Contract (Non-Competition) – Klemm

114.    Arbol incorporates by references and re-alleges all foregoing paragraphs.

115.    The Klemm Agreement is and was a valid, binding, and enforceable contract between Arbol and Klemm.

116.    To the extent Arbol possessed any obligations under the Klemm Agreement, Arbol faithfully performed those obligations.

117.    As described in the foregoing allegations, under the terms of the Klemm Agreement, in exchange for employment and monetary compensation, Klemm agreed that he would not solicit or contact any existing or prospective customer or supplier or business partner of Arbol or engage in any competitive business activities for the purpose or with the intent of using or exploiting any confidential information.

118.    On information and belief, Klemm breached the agreement by soliciting or contacting existing and prospective customers or suppliers or business partners of Arbol and engaging in competitive business activities in connection with his employment at

HCC for the purpose or with the intent of using or exploiting Arbol's confidential information, including its Business Trade Secrets and Technical Trade Secrets.

119.    Klemm's activities are a breach of his obligations under the Klemm Agreement. *See, e.g.*, § 3(b).

120.    As a result of Klemm's breach, Arbol has suffered and will continue to suffer damages in an amount to be determined at trial.

121.    In addition, pursuant to the terms of the Klemm Agreement, Arbol has the right and is entitled to seek enforcement of the Klemm Agreement through equitable relief. *See* § 5.

## FIFTH CAUSE OF ACTION

### Tortious Interference with Contract (Ibarra Agreement) – HCC

122.    Arbol incorporates by references and re-alleges all foregoing paragraphs.

123.    The Deel Agreement is and was a valid, binding, and enforceable contract between Arbol and Deel. The Ibarra Agreement is and was a valid, binding, and enforceable contract between Deel's Spanish affiliate and Ibarra.

124.    On information and belief, HCC was aware of Ibarra's obligations to Arbol, as demonstrated by, among other things, HCC's representations to Arbol that HCC "took affirmative steps prior to hiring these gentlemen to confirm that none of them was in possession of any confidential information."

125.    Despite its knowledge of Ibarra's obligations, HCC engaged in intentional conduct that was a significant factor in causing Ibarra to breach his agreement. On information and belief, HCC induced Ibarra to breach the Ibarra Agreement by offering him employment and monetary compensation with the expectation that he would use Arbol's confidential and proprietary trade secrets, including the Business Trade Secrets and Technical Trade Secrets.

126.    HCC's unjustified conduct only took place as a means to profit from Ibarra's breach of the Ibarra Agreement and cause Arbol competitive harm.

127.    Because of HCC's conduct, Arbol has suffered and continues to suffer damages in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION

### Tortious Interference with Contract (Muir Agreement) – HCC

128.    Arbol incorporates by references and re-alleges all foregoing paragraphs.

129.    The Deel Agreement is and was a valid, binding, and enforceable contract between Arbol and Deel. The Muir Agreement is and was a valid, binding, and enforceable contract between Deel's British affiliate and Muir.

130.    On information and belief, HCC was aware of Muir's obligations to Arbol, as demonstrated by, among other things, HCC's representations to Arbol that HCC "took affirmative steps prior to hiring these gentlemen to confirm that none of them was in possession of any confidential information."

131.    Despite its knowledge of Muir's obligations, HCC engaged in intentional conduct that was a significant factor in causing Muir to breach his agreement. On information and belief, HCC induced Muir to breach the Muir Agreement by offering him employment and monetary compensation with the expectation that he would use Arbol's confidential and proprietary trade secrets, including the Business Trade Secrets and Technical Trade Secrets.

132.    HCC's unjustified conduct only took place as a means to profit from Muir's breach of the Muir Agreement and cause Arbol competitive harm.

133.    Because of HCC's conduct, Arbol has suffered and continues to suffer damages in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION

### Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* – All Defendants

134.    Arbol incorporates by references and re-alleges all foregoing paragraphs.

135.    Arbol owns and possesses confidential and proprietary trade secrets, including the Business Trade Secrets and Technical Trade Secrets.

136.    These confidential and proprietary trade secrets relate to business practices undertaken, or intended to be undertaken, in interstate commerce and globally.

137.    Arbol took reasonable measures to keep its trade secrets and confidential information secret. Among other things, Arbol limited access to personnel on a need-to-know basis using industry-standard security measures like password protection and encryption, secured physical offices spaces, and required all employees and counterparties to sign non-disclosure agreements.

138.    Arbol's confidential and proprietary trade secrets are not available for others in the industry to use through any legitimate means.

139.    Arbol's confidential and proprietary trade secrets derive independent economic value, both actual and potential, from not being generally known to or readily ascertainable by other persons or businesses who could obtain economic value from their disclosure or use. The Business Trade Secrets have allowed Arbol to differentiate itself from competitors by identifying promising clients and proposing custom solutions that suit their business needs. The Technical Trade Secrets have allowed Arbol to price deals in a manner that are profitable to its capacity providers on average, bolstering long-term relationships and allowing Arbol to sell products at a scope that far exceed its own relatively modest balance sheet.

140.    Arbol has expended considerable resources in the creation, development, and refinement of its confidential and proprietary trade secrets.

141.    HCC and the Solicited Employees only received access to this information after signing and agreeing to the terms of their respective agreements (the MNDA, the Klemm Agreement, the Ibarra Agreement, and the Muir Agreement), all of which were executed for Arbol's benefit. Each of them had a duty—and knew they had a duty—to maintain the secrecy of the information they received and not use it except as allowed by the agreements.

142.    Despite HCC's awareness of its duty to maintain the secrecy of the confidential and proprietary trade secrets it learned after signing the MNDA, and despite Arbol's lack of consent to make use of the trade secrets for any purpose other than as provided for in the MNDA, HCC has been using the trade secrets in its own business.

143.    Despite the Solicited Employees' awareness of their duty to maintain the secrecy of the confidential and proprietary trade secrets, and despite Arbol's lack of consent to make use or disclosures of the trade secrets, the Solicited Employees used and disclosed the trade secrets in their employment with HCC, thereby willingly transferring Arbol's confidential and proprietary trade secrets to Arbol's competitor for HCC's and the Solicited Employee's financial gain.

144.    HCC and the Solicited Employees thus misappropriated, and threaten to continue to misappropriate, Arbol's trade secrets in the improper and unlawful manner as alleged herein, including by using Arbol's trade secrets to compete with Arbol and solicit business that HCC and the Solicited Employees would not be able to obtain without Arbol's trade secrets.

145.    HCC's and the Solicited Employees' misappropriation of Arbol's confidential and proprietary trade secrets was intentional, knowing, willful, malicious, fraudulent, and oppressive. HCC and the Solicited Employees have attempted to and continue to attempt to conceal their misappropriation.

146.    HCC's and the Solicited Employees' misappropriation was done with a conscious disregard of Arbol's rights and a desire to profit from such misappropriation while causing Arbol competitive harm. As such, HCC's and the Solicited Employees' misappropriation of Arbol's trade secrets was "willful and malicious" as set forth in 18 U.S.C. § 1836(b)(3)(C) and performed "in bad faith" as set forth in 18 U.S.C. § 1836(b)(3)(D), further entitling Arbol to recover exemplary damages and its attorney's fees and costs.

147.    If HCC's and the Solicited Employees' conduct is not remedied, HCC and the Solicited Employees will continue to misappropriate, disclose, and use Arbol's trade secrets for their own benefit and to Arbol's detriment.

148.    As a direct and proximate cause of HCC's and the Solicited Employees' conduct, Arbol has suffered and will continue to suffer severe competitive harm and significant damages in an amount to be determined at trial.

### EIGHTH CAUSE OF ACTION

### Misappropriation of Trade Secrets Under New York Law – All Defendants

149.    Arbol incorporates by reference and re-alleges all foregoing paragraphs.

150.    Arbol owns and possesses confidential and proprietary trade secrets, including the Business Trade Secrets and Technical Trade Secrets.

151.    These confidential and proprietary trade secrets relate to business practices undertaken, or intended to be undertaken, in interstate commerce and globally.

152.    Arbol took reasonable measures to keep its trade secrets and confidential information secret. Among other things, Arbol limited access to personnel on a need-to-know basis using industry-standard security measures like password protection and encryption, secured physical offices spaces, and required all employees and counterparties to sign non-disclosure agreements.

153.    Arbol's confidential and proprietary trade secrets are not available for others in the industry to use through any legitimate means.

154.    Arbol's confidential and proprietary trade secrets derive independent economic value, both actual and potential, from not being generally known to or readily ascertainable by other persons or businesses who could obtain economic value from their disclosure or use. The Business Trade Secrets have allowed Arbol to differentiate itself from competitors by identifying promising clients and proposing custom solutions that suit their business needs. The Technical Trade Secrets have allowed Arbol to price

deals in a manner that are profitable to its capacity providers on average, bolstering long-term relationships and allowing Arbol to sell products at a scope that far exceed its own relatively modest balance sheet.

155.    Arbol has expended considerable resources in the creation, development, and refinement of its confidential and proprietary trade secrets.

156.    HCC and the Solicited Employees only received access to this information after signing and agreeing to the terms of their respective agreements (the MNDA, the Klemm Agreement, the Ibarra Agreement, and the Muir Agreement), all of which were executed for Arbol's benefit. Each of them had a duty—and knew they had a duty—to maintain the secrecy of the information they received and not use it except as allowed by the agreements.

157.    Despite HCC's awareness of its duty to maintain the secrecy of the confidential and proprietary trade secrets it learned after signing the MNDA, and despite Arbol's lack of consent to make use of the trade secrets for any purpose other than as provided for in the MNDA, HCC has been using the trade secrets in its own business.

158.    Despite the Solicited Employees' awareness of their duty to maintain the secrecy of the confidential and proprietary trade secrets, and despite Arbol's lack of consent to make use or disclosures of the trade secrets, the Solicited Employees used and disclosed the trade secrets in their employment with HCC, thereby willingly transferring Arbol's confidential and proprietary trade secrets to Arbol's competitor for HCC's and the Solicited Employees' financial gain.

159.    HCC and the Solicited Employees thus misappropriated, and threaten to continue to misappropriate, Arbol's trade secrets in the improper and unlawful manner as alleged herein, including by using Arbol's trade secrets to compete with Arbol and solicit business that HCC and the Solicited Employees would not be able to obtain without Arbol's trade secrets.

160.    HCC's and the Solicited Employees' misappropriation of Arbol's confidential and proprietary trade secrets was intentional, knowing, willful, malicious, fraudulent, and oppressive. HCC and the Solicited Employees have attempted to and continue to attempt to conceal their misappropriation.

161.    If HCCs' and the Solicited Employees' conduct is not remedied, HCC and the Solicited Employees will continue to misappropriate, disclose, and use Arbol's trade secrets for their own benefit and to Arbol's detriment.

162.    As a direct and proximate cause of HCC's and the Solicited Employees' conduct, Arbol has suffered and will continue to suffer severe competitive harm and significant damages in an amount to be determined at trial.

## NINTH CAUSE OF ACTION

## Unfair Competition– All Defendants

163.    Arbol incorporates by reference and re-alleges all foregoing paragraphs.

164.    Based on the conduct alleged above, HCC and the Solicited Employees committed acts of unfair competition at Arbol's direct expense.

165.    Arbol acquired its confidential information, business opportunities and strategies, intellectual property, and trade secrets, including the Business Trade Secrets and Technical Trade Secrets, through a significant investment of time, money, and resources. This confidential information confers and will confer value and a competitive advantage to the party in possession of it.

166.    The Solicited Employees, while employed by HCC, unfairly competed with Arbol by using and disclosing Arbol's confidential information, business opportunities and strategies, intellectual property, and trade secrets, including the Business Trade Secrets and Technical Trade Secrets, for their benefit and the benefit of HCC (Arbol's competitor) and against Arbol's legitimate business interests.

167.    HCC's and the Solicited Employees' actual and threatened misappropriation, misuse, and disclosure of Arbol's confidential information, business

opportunities and strategies, intellectual property, and trade secrets have resulted and will continue to result in the commission of acts of unfair competition.

168. HCC's deliberate and intentional violations of its contractual obligations owed to Arbol have and will continue to result in the commission of acts of unfair competition.

169. Klemm's deliberate and intentional violations of his contractual obligations owed to Arbol have and will continue to result in the commission of acts of unfair competition.

170. Ibarra's and Muir's deliberate and intentional violations of their contractual obligations owed to Deel and Arbol have and will continue to result in the commission of acts of unfair competition.

171. HCC and the Solicited Employees misappropriated, misused, and disclosed Arbol's confidential information, business opportunities and strategies, intellectual property, and trade secrets in bad faith in that HCC and the Solicited Employees acted deceptively, illicitly, and anti-competitively and in breach of HCC's and the Solicited Employees' respective contractual duties owed to Arbol.

172. HCC and the Solicited Employees would not have acquired a commercial or competitive advantage or profited from the business opportunities and strategies identified by Arbol without deceptively, illicitly, and anti-competitively acquiring, disclosing, and using Arbol's confidential information, intellectual property, and trade secrets, including the Business Trade Secrets and Technical Trade Secrets.

173. HCC's and the Solicited Employees' acts of actual and threatened unfair competition are without justification because Arbol protected its confidential information through security precautions and confidentiality agreements, including the MNDA, the Klemm Agreement, the Ibarra Agreement, and the Muir Agreement. Arbol relied on and was induced by HCC's and the Solicited Employees' representations in their respective agreements in disclosing its confidential information to HCC and the

Solicited Employees. HCC's and the Solicited Employees' acts of actual and threatened unfair competition are being committed through improper means and have proximately caused or will inevitably cause injury to Arbol.

174.    As a direct and proximate cause of HCC's and the Solicited Employees' conduct, Arbol has suffered and will continue to suffer severe competitive harm and significant damages in an amount to be determined at trial.

## TENTH CAUSE OF ACTION

## Unjust Enrichment – All Defendants

175.    Arbol incorporates by reference and re-alleges all foregoing paragraphs.

176.    Based on the conduct alleged above, HCC and the Solicited Employees unjustly enriched themselves at Arbol's expense.

177.    HCC and the Solicited Employees were enriched by deceptively, illicitly, and anti-competitively acquiring, disclosing, and using Arbol's confidential information, business opportunities and strategies, intellectual property, and trade secrets, including the Business Trade Secrets and Technical Trade Secrets.

178.    HCC and the Solicited Employees would not have acquired a commercial or competitive advantage or profited from the business opportunities and strategies identified by Arbol without deceptively, illicitly, and anti-competitively acquiring, disclosing, and using Arbol's confidential information, intellectual property, and trade secrets, including the Business Trade Secrets and Technical Trade Secrets.

179.    Arbol was severely injured by HCC's and the Solicited Employees' deceptive, illicit, and anti-competitive practices, including by unfairly and unjustly losing the commercial and competitive advantage and profits (both real and future potential) Arbol had gained by developing the information comprising the Business Trade Secrets and the Technical Trade Secrets.

180.    Arbol's injury was directly related to HCC's and the Solicited Employees' enrichment.

181.    HCC's and the Solicited Employees' enrichment at Arbol's expense was wholly without justification because Arbol protected its confidential information through security precautions and confidentiality agreements, including the MNDA, the Klemm Agreement, the Ibarra Agreement, and the Muir Agreement. Arbol relied on and was induced by HCCs' and the Solicited Employee's representations in their respective agreements in disclosing its confidential information to HCC and the Solicited Employees.

182.    As a direct and proximate cause of HCC's and the Solicited Employee's conduct, Arbol has suffered and will continue to suffer severe competitive harm and significant damages in an amount to be determined at trial.

## ELEVENTH CAUSE OF ACTION

### Breach of Fiduciary Duty – HCC

183.    Arbol incorporates by reference and re-alleges all foregoing paragraphs.

184.    Based on the conduct alleged above, Ibarra and Muir breached a fiduciary duty to Arbol.

185.    Starting on or about April 11, 2023 and July 5, 2023, respectively, Ibarra and Muir became directors of Arbol UK. Muir also became a director of Arbol Europe on May 21, 2024. As directors of Arbol's subsidiaries, they each owed Arbol a fiduciary duty.

186.    On information and belief, Ibarra and Muir committed misconduct by agreeing to terminate their employment with Arbol and enter into an employment relationship with HCC for the purpose or with the intent of using Arbol's confidential information to compete with Arbol to their and HCC's benefit and Arbol's detriment.

187.    HCC is vicariously liable for Ibarra's and Muir's acts in breach of their fiduciary duty that occurred after they began their employment with HCC because those acts were performed while in the employment of HCC and were within the scope of that employment or within the authority delegated to the employee.

188.    As a direct and proximate cause of HCC's and the Solicited Employees' conduct, Arbol has suffered and will continue to suffer severe competitive harm and significant damages in an amount to be determined at trial.

## TWELFTH CAUSE OF ACTION

### Breach of Fiduciary Duty – Klemm

189.    Arbol incorporates by reference and re-alleges all foregoing paragraphs.

190.    Based on the conduct alleged above, Klemm breached a fiduciary duty to Arbol.

191.    Starting on or about September 16, 2023, Klemm was appointed Arbol's Chief Revenue Officer. As an officer of Arbol, he owed Arbol a fiduciary duty.

192.    On information and belief, Klemm committed misconduct by agreeing to terminate his employment with Arbol and enter into an employment relationship with HCC for the purpose or with the intent of using Arbol's confidential information to compete with Arbol to his and HCC's benefit and Arbol's detriment.

193.    As a direct and proximate cause of Klemm's conduct, Arbol has suffered and will continue to suffer severe competitive harm and significant damages in an amount to be determined at trial.

## VICARIOUS LIABILITY

194.    Arbol incorporates by reference and re-alleges all foregoing paragraphs.

195.    HCC is vicariously liable for the Solicited Employee's tortious acts and acts in violation of the Defend Trade Secrets Act after the Solicited Employees began their employment with HCC because those acts were performed while in the employment of HCC and were within the scope of that employment or within the authority delegated to the employee.

## JOINT AND SEVERAL LIABILITY

196.    Arbol incorporates by reference and re-alleges all foregoing paragraphs.

197. At all relevant times, Defendants were jointly engaged in the commission of the aforementioned tortious and unlawful actions. On information and belief, HCC and the Defendants acted intentionally, and their actions caused a single, indivisible injury to Arbol. Accordingly, Defendants are jointly and severally liable for all of Arbol's injuries as pleaded herein.

**PRAYER FOR RELIEF**

WHEREFORE, Arbol respectfully requests that the Court enter judgment in its favor and against Defendants as to all Causes of Action of the Complaint stated against them, for:

(a)  specific performance and other equitable relief, including directing HCC and Klemm to comply with their respective contractual obligations to Arbol; directing HCC to terminate Klemm's, Ibarra's, and Muir's employment relationships; and directing HCC and Klemm not to use any confidential information obtained from Arbol or any information derived from that confidential information, including but not limited to the Business Trade Secrets and Technical Trade Secrets;

(b)  compensatory damages arising from the breach of contractual obligations by HCC and Klemm;

(c)  compensatory damages arising from tortious interference, unjust enrichment, unfair competition, and breach of fiduciary duty by HCC (including for vicarious liability based on acts or omissions committed by Ibarra and Muir) and Klemm;

(d)  compensatory damages for actual loss, unjust enrichment, and unfair competition caused by misappropriation of Arbol's trade secrets by HCC (including for vicarious liability based on acts or omissions committed by Ibarra and Muir) and Klemm;

(e)     exemplary damages, punitive damages, consequential damages, and lost profits, including pursuant to applicable statutes and contractual agreements;

(f)     vicarious liability;

(g)     joint and several liability;

(h)     reasonable attorney's fees and costs, including those pursuant to applicable law and contractual agreements;

(i)     pre-judgment and post-judgment interest; and

(j)     any and all further relief as the Court may deem just and proper.

## JURY TRIAL

Arbol hereby demands trial by jury for all causes of action, claims, or issues in this action that are triable by jury as a matter of right.

Dated:  February 18, 2025                        Respectfully submitted,
        New York, New York

                                                 */s/ Leonid Grinberg*
                                                 Leonid Grinberg
                                                 Arbol Inc.
                                                 445 Park Avenue, 10th Floor
                                                 New York, NY 10022
                                                 (225) 230-8749
                                                 leonid.grinberg@arbol.io

                                                 *Counsel for Arbol Inc.*